## STATE v. JOSEPH D. JOHNSON AND OTHERS.

163 N. W. (2d) 750.

December 13, 1968—Nos. 40650, 40651, 40652, 40653.

154

*Stephen B. Swartz, Douglas Hall,* and *Lynn S. Castner,* for appellants.
*Keith Stidd,* City Attorney, and *Edward C. Vavreck, Sr.,* Assistant City Attorney, for respondent.

MURPHY, JUSTICE.

Defendants appeal from convictions for violation of the Minneapolis breach-of-the-peace ordinance and from an order denying their motions for a new trial. They challenge the constitutionality of the ordinance under the First and Fourteenth Amendments to the United States Constitution and the sufficiency of the evidence on which their convictions were based.

The circumstances out of which the offenses arose occurred at about 7 p. m. on July 16, 1966, subsequent to an afternoon street parade held in connection with the Minneapolis Aquatennial, a civic celebration. A group of about 15 members of the Minnesota Committee to End the War

in Viet Nam gathered at the northeast corner of Seventh Street and Hennepin Avenue, a busy intersection in downtown Minneapolis. They placed a stepladder on the sidewalk about 5 feet from the Hennepin Avenue curb at a point where the sidewalk was approximately 15 feet wide. While some members of the group took turns mounting the ladder and, with the aid of a portable microphone, addressing passersby, others held signs and distributed handbills. The theme of the speeches was one of protest against President Johnson's foreign policy, particularly with regard to the war in Viet Nam.

The police had been informed that the meeting was to take place and 15 to 20 officers were either in the area or at the intersection when the speeches began. The testimony of several officers was that a crowd of nearly 200 people gathered around the speakers; that some taunts came from the crowd directed to the speakers; that the police had a difficult time keeping an aisle open on the sidewalk; and that there was some "spillage" of the crowd into the street, blocking a lane of traffic. A police photographer described the congestion this way:

"* * * It became highly congested to where the officers had a hard time keeping the sidewalk open, walking back and forth telling people to keep moving, step back as soon as they did, it would fill in behind them right away. Eventually it grew out over the sidewalk and the traffic became snarled, cars had to stop one way, pull out in another lane to get around."

After tolerating these conditions for about 15 minutes, the police moved in to disperse the crowd and to arrest the speakers for violating Minneapolis Code of Ordinances, § 872.040, requiring that the American flag be displayed at public gatherings, and for breach of the peace. When defendant Larry Seigle admitted that he was the organizer of the meeting, he was charged with violation of the flag ordinance and arrested.

Apparently, in response to Seigle's arrest, another member of the group, Roger Hagon, threw his hands into the air and exclaimed, "If he goes to jail we go too." This seems to have been the basis for Hagon's arrest, although the fact that he was "off the curb" at the time may have

been a contributing factor. Hagon insists that he was never told he was under arrest; rather that his "arrest" came about through a sort of mutual agreement between him and one of the police officers that he could ride along to jail with his friends. Hagon's wife, Mary Kay, wanted to be with her husband, so she climbed into a police car and thus was "arrested." The charges against the Hagons were later dismissed.

The circumstances surrounding defendant Keith Ruona's arrest are not entirely clear. One police officer testified that, apparently in response to Hagon's outcry that all should go to jail, Ruona prostrated himself in the street. Here is Ruona's version of his arrest:

"* * * I was just wondering, 'Am I going to get arrested,' because I thought I saw them grab Jim and I had the sign up, so I brought the sign down and I said, 'Well, if they arrest me with the sign down like this, then that's too bad,' and I said, 'I will be arrested,' and I had come around, I stepped out of the crowd, I just wanted to get out of there and was over on the 7th Street side of the traffic light, just to the 7th Street side and two officers approached me from my front. I was facing off across Hennepin Avenue and two officers approached me from my front. I believe only one of them said, 'You're under arrest,' and then one took me, I think either by the arm and started me across the street. Now, it has been said I only got a couple steps out, but after looking at the pictures, I know I was further out and I heard Roger yell behind, 'Let's go with them,' you know, and made me feel kind of good and the two policemen heard, and stopped and turned around and let go of me and at this time, to myself, I said, 'Nobody is going to take me off my own property,' and public property, for having done nothing without any trouble, so I went down to the ground and that's—I was carried and they treated me very well. I was surprised, I heard of how heads get banged. They were saying as they went across the street, 'Let's not drop him,' or anything."

The circumstances of defendant Joseph D. Johnson's arrest are equally uncertain. Chief of Police Calvin Hawkinson testified that he arrested Johnson when Johnson physically interfered with Hawkinson's attempt to subdue an unknown lady who attacked the police. He testified that

"Johnson * * * put his arms in between [us] and tried to push us apart."

Defendant Lee W. Smith was one of those who admittedly spoke while standing on the ladder. Like Hagon, it would appear that he offered himself into police custody and was not formally arrested. After hearing Hagon's suggestion that all should go to jail, Smith "decided Roger had a very good idea." He told officers who were transporting Ruona to a police car, that "We are coming too," to which an officer replied, "We have plenty of room."

One James Krahn was arrested for approaching one of the officers with a menacing look. The court found Krahn not guilty. Smith, Johnson, Ruona, and Seigle were convicted of breach of the peace. The court imposed fines ranging from $25 to $75, or, in the alternative, maximum jail sentences of from 5 to 15 days.

It may be observed that the police authorities who had the responsibility of maintaining order in the area had difficulty in determining how to cope with the curious conduct of the demonstrators. It seems they felt that they should do something more than warn the group or tell them to move on and concluded that the conduct they observed was such as to warrant arrest and prosecution. It was first decided to prosecute for violation of § 872.040, the so-called "flag ordinance," which provides that no one shall speak to or address an assembly of 10 or more persons upon a public street except in the immediate presence of an unfurled United States flag of a certain size "mounted upon an upright flagstaff * * * or attached to or placed upon a movable or permanent stand." In an interesting and well-written memorandum, which space prevents us from reproducing, the trial court decided that this ordinance was unconstitutional. It should also be noted that defendants were not charged with violation of § 875.030, which prohibits use of "sound amplifying equipment" under certain circumstances, nor was it felt that defendants could properly be charged with violation of § 408.090, which relates to the obstruction of the "free passage of pedestrians" on sidewalks. The authorities accordingly fell back upon the catchall phrase found in § 870.060, which punishes "conduct which disturbs the peace and quiet

of another." [1] Defendants call attention to the provisions of § 870.060, which punish acts of rioting, fighting, brawling, tumultuous conduct, or violence in any public or private place, and correctly assert that the record does not contain evidence of the commission of such acts. The main thrust of their attack is, however, focused upon that provision of the ordinance which makes unlawful "other conduct which disturbs the peace and quiet of another." They contend that that part of the ordinance is unconstitutionally vague and indefinite and is, consequently, a denial of the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. They also call attention to the fact that since the offending conduct here involved the spoken or printed word, the ordinance cannot be constitutionally applied because to do so would be a deprivation of the freedom of expression and freedom of assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution.

While the trial court conceded that the ordinance under which defendants were charged was "necessarily not specific in its delineation" of what constituted the offense, it appears that he felt that the evidence establishing and the circumstances surrounding the presence of the ladder on the street corner and the use of the sound amplifier were, under the circumstances, sufficient to sustain the charge.

■ With reference to defendants' claim that the ordinance is unconstitutionally vague and indefinite, it must be conceded that a penal statute or ordinance creating an offense should be sufficiently explicit to enable one of common knowledge to ascertain what conduct is prohibited thereby. Connally v. General Const. Co. 269 U. S. 385, 46 S. Ct. 126, 70 L. ed. 322; Lanzetta v. New Jersey, 306 U. S. 451, 59 S. Ct. 618, 83 L. ed. 888; Cramp v. Board of Public Instruction, 368 U. S. 278, 82 S. Ct. 275, 7 L. ed. (2d) 285; Winters v. New York, 333 U. S. 507, 68

---

[1] Minneapolis Code of Ordinances, § 870.060, provides: "No person, in any public or private place, shall engage in, or prepare, attempt, offer or threaten to engage in, or assist or conspire with another to engage in or congregate because of, any riot, fight, brawl, tumultuous conduct, act of violence, or any other conduct which disturbs the peace and quiet of another save for participating in a recognized athletic contest."

S. Ct. 665, 92 L. ed. 840; Cantwell v. Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. ed. 1213. While this court has had little occasion to discuss the elements of this particular offense,[2] it may be observed that the term "breach of the peace" is a generic term which includes all violations of the public peace or order calculated to disturb the tranquility which members of the public are entitled to enjoy. The culpability of the offense depends upon time, place, and circumstance. The offense may arise out of acts of violence or conduct causing or likely to cause an immediate disturbance of the public order. Restatement, Torts, § 116; 12 Am. Jur. (2d) Breach of the Peace, § 7. Because the offense of "breach of the peace" comprehends an undesirable form of conduct rather than a specific act, no single definition can cover the full range of acts which may constitute the offense. Here, defendants were "tab charged" in municipal court with wrongful conduct included within the broad proscription of the ordinance. We do not think defendants can seriously argue that they were unaware of the nature of the offense with which they were charged, nor do we think the fact that the specific elements of the offense are not outlined in the ordinance is fatal to the prosecution.

■ We agree with defendants that the ordinance may not be used to punish the expression of unpopular ideas. The expression of unpopular views is constitutionally protected, even though it may annoy and irritate and arouse hostility. Edwards v. South Carolina, 372 U. S. 229, 83 S. Ct. 680, 9 L. ed. (2d) 697; Cox v. Louisiana, 379 U. S. 536, 85 S. Ct. 453, 13 L. ed. (2d) 471. As Mr. Chief Justice Hughes stated in Stromberg v. California, 283 U. S. 359, 369, 51 S. Ct. 532, 536, 75 L. ed. 1117, 1123:

"* * * The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an oppor-

---

[2] The related offense of disorderly conduct is discussed in City of St. Paul v. Morris, 258 Minn. 467, 104 N. W. (2d) 902, certiorari denied, 365 U.S. 815, 81 S. Ct. 696, 5 L. ed. (2d) 693, and State v. Reynolds, 243 Minn. 196, 66 N. W. (2d) 886.

tunity essential to the security of the Republic, is a fundamental principle of our constitutional system."

If we were satisfied that the thrust of the prosecution against these defendants constituted a denial of their First Amendment rights of freedom of speech and freedom of assembly, we would have no hesitation in setting aside the convictions.

■ We are not satisfied, however, that the trial court was in error in determining that the wrongful acts of defendants, as a group, constituted the public offense of breach of the peace. First and Fourteenth Amendment rights to use public streets as a forum to express ideas are not absolute. These rights may not be exercised so as to deny concomitant rights of others. Rather than establishing a denial of defendants' rights by police officers, the trial court might well conclude that the evidence established that defendants denied or interfered with the rights of others to use the streets and sidewalks without obstruction, interference, or disturbance. The trial court could well conclude that in asserting their own rights to express their views, they overlooked the rights of others to peacefully use public thoroughfares.[3] Here it would appear that there was ample justification for the police officers to intervene in the interest of maintaining public order. In discussing this issue, the United States Supreme Court in Cox v. New Hampshire, 312 U. S. 569, 574, 61 S. Ct. 762, 765, 85 L. ed. 1049, 1052, said:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The

---

[3] In a recent address to newly admitted members of the bar, the chief justice of this court said: "Freedom as we know it does not mean you have the privilege of trampling on the rights of others. To me it means the right to live with as few restraints as will permit others to enjoy the same privileges as you have."

control of travel on the streets of cities is the most familiar illustration of this recognition of social need."

From the record it fairly appears that defendants chose to set up a meeting at a busy downtown intersection during a civic celebration when a post-parade crowd would be in the area, and by use of apparatus of noise and obstruction by means of a sound amplifier and a ladder created congestion of traffic, both on the street and on the sidewalk, accompanied by a disturbance of the crowd and a blaring noise that could be heard at least a half block away.

The confused and vague record presents us with difficulties in our review of these decisions, which review must necessarily be limited by the record with which we are provided. The record fairly establishes a pattern of wrongful conduct by defendants as a group, but it must be kept in mind that defendants are not charged with a conspiracy. We must examine the record as it bears upon the wrongful conduct of the individual defendants separately charged with a breach of the peace. Since we are not satisfied that the record satisfactorily contains evidence of the wrongful conduct committed by each defendant individually, we conclude that the convictions should be set aside and the cases remanded for a new trial.

Reversed and new trial granted.